### Fitzpatrick's Committee v. Dundon.

### Fitzpatrick's Committee v. Kinsolving.

(Decided March 15, 1918.)

### Appeals from Montgomery Circuit Court.

1. Attorney and Client—Services—Fees.—An attorney may recover reasonable fees for reasonable and necessary services rendered an incompetent person; but it will not be presumed that the services were necessary because they were rendered at the instance of the incompetent person.

2. Attorney and Client—Services—Fees.—The rule permitting an attorney to recover compensation for his services rendered an incompetent person, rests upon the fact that the services have been faithfully and intelligently performed and not upon the fact that they have been successful or beneficial to the client.

3. Attorney and Client—Defense of Insane Person—Fees.—Where an unnecessary number of attorneys are employed by a person of unsound mind to defend him in proceedings to have him adjudged of unsound mind the court should make an allowance sufficient to cover the reasonable fees of all the attorneys so defending, and apportion it among them according to the services rendered by them respectively.

4. Attorney and Client—Defense of Insane Person—Fees—Allowance.—Where two attorneys sued to recover for services rendered to a person of unsound mind in a proceeding to have him adjudged restored to his senses, and made the other attorneys who had rendered similar services in the same proceeding parties defendant to their action, they properly brought before the court the whole question relating to attorneys' services rendered to the incompetent and the court properly allowed them to recover for their necessary services so rendered.

5. **Insane Persons—Settlement of Estate—Management.**—Where the estate of an incompetent person is in the custody of the chancellor for settlement or administration, no one can interfere with its management by suit or otherwise without leave of the court; and while it is the duty of a person seeking to bind an incompetent's estate while in the custody of the court to first obtain the approval of the chancellor, his act in suing the incompetent may be subsequently approved by the chancellor if it be such a case that he would have given his approval had it been asked in advance.

6. **Attorney and Client—Insane Person—Services Rendered—Fees.**—Where attorneys were employed by a person of unsound mind under an implied contract that they would be paid a reasonable compensation for their services, and represented the incompetent in several trials of an action, they may retire from further service, and their retirement will not defeat their right to recover for the services theretofore rendered.

7. **Evidence—Declarations Against Interest.**—Written declarations against interest may be in any form capable of conveying thought; they may consist of solemn and formal documents such as deeds, mercantile papers, accounts, receipts, or casual papers such as loose memoranda.

8. **Attorney and Client—Services Rendered Insane Person—Payment.**—Where an attorney rendered services to a person of unsound mind and received from him a check written by the attorney with the memorandum, "in full of account to date," on the face of the check, the attorney cannot recover for services theretofore rendered.

9. **Attorney and Client—Services—Fees.**—In estimating attorneys' fees, in the absence of an express contract, it is competent to consider the amount and character of the services rendered, the labor, time, and trouble involved, the nature and importance of the litigation or business in which the services were rendered, the amount of money or the value of the property affected by the controversy or involved in the employment, the skill and experience called for in the performance of the services, and the professional character and standing of the attorney.

ROBERT H. WINN, C. W. NESBIT and W. B. WHITE for appellant.

JOHN G. WINN, R. A. CHILES, GEORGE DuRELLE and DAVID D. CLINE for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming in Dundon's case and reversing in Kinsolving's case.

On May 20, 1911, W. T. Fitzpatrick, a successful farmer and business man of Mt. Sterling, was found to be a person of unsound mind and incompetent to manage

his estate, by an inquest and judgment of the Montgomery county court. A. S. Hart qualified as committee and shortly thereafter instituted an action in the Montgomery county court to settle the estate of Fitzpatrick. In 1914 Hart resigned as Fitzpatrick's committee and the appellant A. L. Tipton succeeded him in that capacity, and as plaintiff in the settlement suit.

On October 4, 1912, seventeen months after the inquest, Fitzpatrick instituted an action in the Montgomery county court seeking to have it adjudged that he had been restored to his senses; but the judgment was to the effect that Fitzpatrick was at that time a person of unsound mind and incompetent to manage his estate. The appellees Dennis Dundon and H. V. Kinsolving did not represent him in that proceeding.

Again, in the fall of 1913, Fitzpatrick instituted a second action in the Montgomery county court in which he again sought to have it adjudged that he had been restored to his senses. In this proceeding Fitzpatrick was represented by the appellees Dundon and Kinsolving, as his attorneys.

That case was tried six times—thrice in the Montgomery county court and an equal number of times in the circuit court. The first two trials in the county court resulted in hung juries. Upon the third trial, however, the verdict and judgment of the county court declared that Fitzpatrick had been restored to his senses, and from that judgment Fitzpatrick's wife and his committee prosecuted an appeal to the Montgomery circuit court.

The first two trials in the circuit court resulted in hung juries; but in the last trial in that court there was a verdict and judgment that Fitzpatrick was a person of unsound mind and incompetent to manage his estate. The appellees Dundon and Kinsolving represented Fitzpatrick in the three trials in the county court, and also in the first trial in the circuit court; and shortly after the first trial in the circuit court they applied to the Court of Appeals for a writ prohibiting the circuit judge from taking jurisdiction of the appeal from the Montgomery county court to the Montgomery circuit court upon the ground that no appeal could be taken from the county court to the circuit court, in such a case. The Court of Appeals, however, denied the writ. See Fitzpatrick v. Young, 160 Ky. 5. On the second trial in the circuit court Fitzpatrick was represented by Dundon, John G.

Winn, and R. A. Childs as his attorneys; and in the third trial in the circuit court Fitzpatrick was represented by E. J. Hobdy alone.

On August 26, 1915, the appellee Dundon instituted an action in the Montgomery circuit court in which he sought to recover judgment against Fitzpatrick's committee for the sum of $3,000.00 for the legal services above recited, and for the further sum of $78.66 expenses, subject to a credit of $100.00 which had been paid to him by Fitzpatrick; and on September 2, 1915, the appellee Kinsolving instituted a similar suit for $3,000.00 for legal services, and $11.72 expenses, subject to a credit of $100.00 paid him by Fitzpatrick. The two cases were consolidated with each other, and were afterwards consolidated with the settlement suit.

After controverting the petition, and by way of affirmative defenses, the answer alleged, (1) that prior to the performance of the services sued for, Dundon and Kinsolving had been informed by Drs. Clarke, Sprague, and Nevitt, alienists of recognized ability who had examined Fitzpatrick at the instance of Dundon and Kinsolving, that Fitzpatrick was incompetent and unable to manage his estate and that Dundon and Kinsolving knew that no legal services were or could be necessary or usefully rendered Fitzpatrick in an effort to obtain a judgment of restoration; (2) that Dundon and Kinsolving knew of the pendency of the chancery suit to settle Fitzpatrick's estate and failed to obtain the consent of the chancellor before filing their actions; (3) that before the final determination of the question of Fitzpatrick's competency in the actions instituted by them, Dundon and Kinsolving abandoned their client and his cause and thereby waived their right to any compensation for services theretofore rendered; (4) that on Feb. 11, 1914, shortly after the last trial in the county court, Fitzpatrick paid Kinsolving $150.00 in full for his services to that date; and that in no event could Kinsolving be entitled to recover for any services except for those thereafter rendered in the action for the writ of prohibition in the Court of Appeals, and in the first trial of the circuit court.

Upon issues made and proof taken the chancellor gave Dundon and Kinsolving separate judgments for $1,500.00, subject in each case, to a credit of $100.00. From those judgments Tipton as committee prosecutes these appeals, and asks a reversal upon four grounds: (1) that neither

petition stated a cause of action; (2) that appellees' failure to obtain from the chancellor permission to file their actions against the committee absolved the property of the incompetent from the payment of the fees claimed; (3) that appellees abandoned Fitzpatrick and his case before its final determination, and thereby waived any and all rights for services theretofore rendered therein; and, (4) as to the judgment against Kinsolving, that he had been paid in full except  possibly for services rendered in the prohibition suit in the Court of Appeals, and in the first trial in the circuit court.

We will dispose of the questions in the order given.

1.   The contention that neither petition states a cause of action is based upon a conclusion drawn from certain language of this court found in the opinion in McKee's Admr. v. Ward and Dickson, 18 Ky. L. Rep. 987, 38 S. W. 704.  In that case Ward and Dickson, attorneys, sued McKee on a contract for services rendered in a proceeding for the appointment of a trustee and committee for McKee.  The answer alleged that at the time the services were rendered McKee was of unsound mind and had not sufficient mind to understand or to make the contract sued on, or to authorize the employment of plaintiffs.   The answer did not deny the execution of the contract, or that the services were rendered, or that the amount charged was reasonable.  A demurrer was sustained to the answer; and, the action having resulted in a judgment for the attorneys, McKee's administrator appealed.

After saying that if McKee's condition was properly described in the answer he was incapable of making a contract for any certain amount of compensation for the services of his attorneys who defended him in the proceedings to have him declared of unsound mind, and that McKee could not bind himself or his estate for any sum for such purpose unless the services were necessary to properly conduct his resistance to the proceedings, the court further said:

"It would not do to say that where proceedings are instituted to have one adjudged *non compos mentis* that he can not be made liable for the services of attorneys reasonably necessary to defend the proceeding.  If that were the case wherever such proceedings were instituted, he would be deprived of means necessary to properly try the question involved.  If he is adjudged of unsound mind or to be a lunatic, it means that the management of his

estate is taken from him, and perhaps the control of his person will be given to another. It is just and lawful that he should have the privilege of every reasonably available means to resist such proceeding, and this he will not have if he cannot bind himself or estate for reasonable attorneys fees to a necessary number of lawyers. Although he may be in such proceedings adjudged of unsound mind, and have been so at the time they were instituted, still it would not follow that reasonable compensation should not be paid attorneys reasonably necessary to conduct his defense.

"If he were of unsound mind he could not bind himself or estate for the services of attorneys, regardless of number and necessity for their services. If he have attorneys representing him, and desires others to assist, then those whom he so desires to assist can not render services and compel his estate to pay them, unless such service were reasonably necessary in the conduct of the defense.

"While the court knows that, in proceedings to have one adjudged of unsound mind, he is entitled to have the services of an attorney, for the reasonable compensation of which his estate is liable, still it can not presume that because they were rendered at the instance of the person of unsound mind they were necessary."

And, in closing the opinion the court added this observation:

"A case might arise where an unnecessary number of attorneys began their work at the same time and under like circumstances, when it would be proper to make an allowance of a proper amount to cover a reasonable expense of attorneys for defending an inquisition, and apportion it among the attorneys rendering the services."

In view of the language last above quoted appellant contends that it was incumbent upon the appellees Dundon and Kinsolving to state the whole case in their petitions by showing that the services rendered by all the lawyers to Fitzpatrick in this proceeding were necessary for his defense, the value thereof, and the proportion to which the plaintiffs were entitled; and that since the petitions merely alleged that the plaintiffs' services were necessary to Fitzpatrick, and their value, they were subject to demurrer.

Of course, if a greater number of attorneys were employed than was reasonably necessary to fully protect

Fitzpatrick's interests, no recovery could be had for the excessive portion of the services, and it might be necessary in such a case, as was stated by the court in McKee's Admr. v. Ward, *supra,* for a single allowance to be made for all the services rendered and to apportion it among the attorneys ratably. This rule necessarily grows out of the fact that, a person of unsound mind being unable to contract for himself, the court in representing the incompetent person will restrict the attorneys to necessary services and reasonable fees in order that the estate may not be squandered.

But the error in the petition, if there was an error, was cured by the subsequent proceedings by which the court, at the insistence of appellant, required all the attorneys who had rendered services to Fitzpatrick to be made parties to this action. Two of them answered saying they had no claim, and Hobdy the remaining attorney having failed to answer after being duly summoned, it was adjudged that he was entitled to no compensation for his services. The result was that the services rendered by all the attorneys who took any part in the litigation in behalf of Fitzpatrick were brought before the court, and the court necessarily had them in mind in rendering the judgments appealed from.

The court had before it the whole case upon the subject of attorneys' fees and allowed appellees only what it considered their proportion of a reasonable allowance for services that were necessary, ignoring the contracts that Fitzpatrick had made and notes he had given appellees for fees. It is apparent therefore that appellant could not have been prejudiced in the court's overruling the demurrers to the petitions.

There can be no doubt that an attorney may receive reasonable fees for reasonable and necessary services rendered an incompetent. It was so decided in McKee's Admr. v. Ward and Dickson, *supra,* where the court said that while an incompetent person is not liable upon his contract, he is liable for the reasonable value of reasonable and necessary services rendered for the protection of his person or property, and that attorneys' fees so rendered are necessaries. Re Freshour, 174 Mich. 114, 45 L. R. A. (N. S.) 67, Ann. Cas. 1915A, 726, runs on all fours with the McKee case. In the Freshour case, as here, an attorney sued to collect his fee for services rendered Mrs. Freshour in obtaining her release from an infirmary to

which she had been committed pursuant to an inquest. In sustaining the attorney's claim for his fee the court said:

"It is the contention of the counsel for appellant that the claimant in this cause acted without any authority whatsoever; that Mrs. Freshour was incompetent to make any contract; that it was claimant's duty to lay the facts before the probate court of Montcalm county and ask for leave to institute proceedings; and that, no such proceedings having been taken by herself or the guardian of the incompetent person, he cannot recover.

"It is an old and well-established rule of law that, when necessaries have been furnished to a person, it matters not whether the recipient is mentally competent or otherwise. If there is no express agreement to pay for the necessaries, an implied agreement arises. The rule is stated in volume 4 of Cyclopedia, on page 993, as follows: 'The services of an attorney will usually be considered as necessaries, and a promise to pay for them will be implied, when rendered in a proceeding personal to an infant or other person incapable of entering into a contract, such as an habitual drunkard or an insane man.'

"It is claimed in this cause that the attorney is not entitled to compensation because his efforts did not result to the benefit of Mrs. Freshour. We hold the rule to be that an attorney is entitled to compensation for his services whether those services have been beneficial to his client or not, so long as the services have been faithfully and intelligently performed." Carter v. Beckwith, 128 N. Y. 312, and Hallet v. Oakes, 1 Cush. 296, are to the same effect.

The rule is formulated as follows in 22 Cyc. 1181:

"Reasonable counsel fees for services rendered the committee or guardian in defending and protecting the estate of his ward may properly be allowed against the estate, and counsel fees may also be allowed for services rendered directly to the lunatic in good faith and on reasonable grounds, as in opposing or attempting to supersede the inquisition of lunacy, or prosecuting *habeas corpus* proceedings to investigate the grounds of the detention of one restrained as a lunatic. Costs incurred by the guardian or committee of a lunatic in good faith in the prosecution and defense of suits on behalf of the lunatic may be charged upon the lunatic's estate."

And, the rule permitting an attorney to recover compensation for his services rests upon the fact that they have been faithfully and intelligently performed and not upon the fact that they have been successful or beneficial to the client.

Upon the question of the appellees' good faith in instituting these proceedings it is sufficient to say that one-half of the local physicians who knew Fitzpatrick and examined him, were of opinion that his senses had been restored; that in four trials the jury disagreed upon that subject; and that in the third trial in the county court the jury found that Fitzpatrick was restored to his senses. It was not until the sixth trial that the jury agreed that he was still incompetent. If any statement beyond that of the attorneys was necessary to show their good faith we think these facts just mentioned fully sustain their contention in this respect.

2. It must therefore be conceded, under the authority of these cases, especially under the McKee case, that each of the appellees had a cause of action. Are they to be defeated by their failure to first obtain the chancellor's permission to enforce their claims? This defense was raised by special demurrer, and also by the fourth paragraph of the answer.

In some jurisdictions the committee of a lunatic cannot be sued without leave of court first obtained; but we are not advised that it has ever been so held by this court. 22 Cyc. 1126. The contention that this action should have abated for plaintiffs' failure to first obtain permission to sue is based upon the general equitable doctrine that where a trust estate is in the custody of the chancellor for settlement or administration no one can interfere with its management without leave of the court. It is, for the time being, the custodian and guardian of his estate; and to permit the incompetent to expend his estate, or make it liable for his contracts would annul the court's supervisory power. This supervisory power is expressly given by section 2149 of the Kentucky Statutes, which provides in part, as follows:

"The several circuit and county courts have power and jurisdiction within their respective counties of the care and custody of the persons and estates of all idiots, lunatics, those who, from confirmed bodily infirmity, are unable to make known to others by speech, sign or otherwise their thoughts or desires, and by reason thereof, in-

competent to manage their estates, and those whose minds, on account of any infirmity or weight of age, have become so imbecile or unsound as to render them incompetent to manage their estates.''

It is further shown, if not admitted, that Dundon and Kinsolving knew of the pendency of the committee's suit and that Fitzpatrick's estate was thus in the hands of the court for administration at the time they accepted employment to render the services for which they now sue.

It will readily be admitted that it is the willing duty of the chancellor to protect an incompetent person both in the care of his person and his property, since it is the peculiar province of a court of chancery to protect those who are unable to protect themselves. Nailer v. Nailer, 4 Dana 443; Upton v. Bush, 135 Ky. 102; Harding v. Harding, 140 Ky. 277. And, in affording full protection it is unquestionably the duty of the chancellor, after the incompetent's estate has come under his supervision, to take all proper remedies to enforce that supervision. One proper measure is to require the approval of the chancellor before setting forth in any procedure that may require expenses, or be of doubtful expediency. This duty rests equally upon the committee or an attorney representing the incompetent.

But the rule should not be pressed beyond the requirements necessary to accomplish its purpose. If the end be accomplished by other appropriate procedure, we see no merit in adhering to one particular method not required by statute.

This duty to obtain the approval of the chancellor is analagous to that imposed upon a guardian whose action, unauthorized in advance, will be subsequently approved if it be such that the chancellor would have given his approval in case it had been asked in advance. That was, in effect, the course taken in this case.

These suits were not only instituted in the court in which the settlement was pending, but they were consolidated with the settlement suit and tried as a part of it. In that way the chancellor gave his full approval and consent, and tried the cases, thereby accomplishing everything that could have been accomplished in case the appellees had obtained his consent in advance.

3. It is next insisted that Kinsolving abandoned Fitzpatrick's case before the second trial in the circuit court, and that Dundon abandoned him after that trial. Kin-

solving explains his retirement by saying that he received a letter signed by Fitzpatrick, or at his direction, discharging him from further service; while Dundon states that he retired after the second trial in the circuit court because of a disagreement between himself on one side, and Fitzpatrick, and his son, and Hobdy the new lawyer who had been invited into the case from a distant point in the state on the other side, as to the management of the case. It nowhere appears that Dundon or Kinsolving were asked to continue in the case; on the contrary it appears that Hobdy superseded them, as heretofore stated, at the direction of Fitzpatrick. The legal effect of the employment of Dundon and Kinsolving was that they were to be paid a reasonable fee for services rendered, not that they were to try the case to completion under a contract for a fixed fee or to continue in the case until its final determination, or for an unreasonable time. There was no breach of contract; on the contrary Kinsolving was discharged, and Dundon retired for good cause; and no one ever objected to the action of appellees, or asked them to continue in the case. P. C. & St. L. R. R. Co. v. Woolley, 12 Bush 451. They, therefore, waived none of their rights by retiring under these circumstances.

4. No complaint is made that the judgments are excessive. It is insisted, however, that Kinsolving was paid $150.00 by Fitzpatrick on Feb. 11, 1914, in full of his services to that date, which would in any event leave him still entitled to compensation for his services in the prohibition suit in the Court of Appeals, and in the first circuit court trial. The circuit court ignored the plea.

This plea of part payment is based upon the following check:

"Mt. Sterling, Ky.,

Feb. 11, 1914.

"THE MT. STERLING NATIONAL BANK.
"Pay to H. B. Kinsolving or bearer
"One hundred and fifty ($150.00) dollars
"For..................In full of account to date.
"W. T. FITZPATRICK."

With the exception of the printed matter and Fitzpatrick's signature this check is in the handwriting of Kinsolving, and it was endorsed by him and collected. Kinsolving offered to explain that the check was in payment for other services rendered Fitzpatrick in an unimportant claim and delivery suit for an old will and for writing a new will; but this testimony was properly rejected by the trial court, and there is no other proof upon the subject. As to this issue, therefore, the case stands upon the check alone.

It will be remembered that this check was written by Kinsolving shortly after Fitzpatrick had been declared, in the third county court trial, to be of sound mind. Apparently, the possibility of an appeal to the circuit court was not in contemplation. When therefore Kinsolving wrote the check and accepted it ''in full of account to date'' is was not only a declaration against interest but it was in effect a receipt. In 4 Chamberlayne's ''Modern Law of Evidence,'' sections 2787 and 2788, it is said:

''2787. Written declarations against interest may be in any form capable of conveying thought. They may consist of solemn and formal documents such as deeds. Mercantile papers, e. g., accounts, or receipts may also be the vehicle conveying a declaration against interest. The writings may even consist of casual papers such as loose memoranda.

''That the memorandum containing the declaration against interest is made by private marks the significance of which is known to the writer alone does not render it inadmissible.

''2788. The rule admitting the declarations against the interest of the declarant extends in its scope not only so far as to receive them in proof of the facts directly asserted, but also of such incidentally stated facts as judicial administration may regard as fairly constituting part of the statement itself. Thus, a written receipt for money proves not only the fact that the money was received, but also the *date* at which it was done, the person from whom the money came or regarding the nature of the claim upon which payment was made. Any special circumstances regarding the transaction, e. g., the amount of rent which a tenant is under obligation to pay or the source of a title may be shown in the same way.''

With the receipt standing alone and unexplained it is possible to reach only one conclusion, to-wit, that it means

what it says and constitutes a payment in full of all services rendered Fitzpatrick up to that date, leaving due Kinsolving only his compensation for subsequent services rendered in the prohibition application in the Court of Appeals, and in the first trial in the circuit court.

The rule in fixing the value of an attorney's services was stated in Morehead's Trustee v. Anderson, 125 Ky. 87, as follows:

"In estimating the amount of compensation to which an attorney is fairly entitled, in the absence of an express contract, and when the understanding is that his charge is to be reasonable, it is competent to consider the amount and character of the service rendered, the labor, time, and trouble involved, the nature and importance of the litigation or business in which the services were rendered, the amount of money or the value of the property affected by the controversy or involved in the employment, the skill and experience called for in the performance of the services, and the professional character and standing of the attorney. Am. & Eng. Ency. of Law, vol. 3, p. 420; Louisville Gas Co. v. Hargis, 33 S. W. 946, 17 Ky. Law Rep. 1190; Downing v. Major, 2 Dana (Ky.) 228."

Moreover, an attorney's services are, in the end, to be intelligently examined by the court and their value largely fixed from the observation and experience of the judges themselves. Jordan v. Swift Iron & Steel Works, 14 Ky. L. R. 194; Germania Vault & Trust Co. v. Hargis, 23 Ky. L. R. 847, 64 S. W. 516; Morehead's Trustee v. Anderson, 125 Ky. 77; Trimble & Bell v. Acme Mills Co., 151 Ky. 576; Adams Express Co. v. James, 164 Ky. 488; Head v. Hargrave, 105 U. S. 45.

Kinsolving participated in five trials, and the chancellor valued those services at $1,500.00, being at the rate of $300.00 for each trial. There is, however, no testimony in the record which addressed itself to the value of these subsequent services as compared with the preceding services. But it is not contended, and we will not assume in the absence of proof, that any one of the five trials was more difficult or authorized a larger fee than the other trials; on the contrary we feel impelled to conclude that the finding of the chancellor, in this respect, should be given a preponderant weight.

We conclude, therefore, that Kinsolving's compensation for the services rendered in the prohibition case and

in the first trial in the circuit court should be fixed at $600.00 and it is so ordered.

Judgment affirmed in Dundon's case, and reversed in Kinsolving's case with instructions to the circuit court to enter a judgment awarding Kinsolving $600.00 as above indicated.